# THE ILLINOIS CENTRAL RAILROAD COMPANY

*v.*

# PARKER S. ADAMS.

1. NEGLIGENCE—*common carriers.* Where live hogs are shipped in railroad cars, and, by reason of their crowded and unnatural condition, become heated, which can only be allayed and the property saved by throwing water upon them while in the cars, and this fact is made known to the conductor of the train, and it being customary for them to apply water in such cases, and they, having the necessary conveniences for applying the water, neglect so to do, in consequence of which some of the hogs die, such conduct would be gross negligence on the part of the conductor, for which the company would be liable.

2. SAME—*extent to which they may contract against their own negligence.* While a railroad company may protect itself by contract against certain risks

assumed by common carriers, and belonging to their vocation, it is contrary to good morals and public policy that they should be allowed to stipulate against their own gross negligence, or that of their employees, or their willful defaults.

3. JURY—*what is their province to decide.* It is exclusively the province of the jury, where the evidence is conflicting, to weigh the testimony of the witnesses, and give credence where they may think it most properly belongs; and with their decision in this regard, courts will not interfere.

APPEAL from the Circuit Court of De Witt county; the Hon. JOHN M. SCOTT, Judge, presiding.

This was an action on the case, brought by Adams against the Illinois Central Railroad company, as common carriers, in the Circuit Court of De Witt county, to recover damages for injuries occasioned by the negligence of the company in transporting two car loads of live hogs from Clinton to Chicago, by reason of which a number of hogs died.

The declaration contained four counts. A demurrer was sustained in the court below to the first, second and third, and overruled as to the fourth. A trial was had on the fourth count, which is in substance as follows:

That on the 4th day of May, A. D. 1865, the defendants were common carriers of goods, chattels and live stock by railroad cars from Clinton, in De Witt county, to Chicago, in Cook county; and, being such common carriers, the defendants, on the day and year aforesaid, at Clinton aforesaid, as such common carriers, accepted and received of and from the plaintiff two car loads of hogs, the property of the plaintiff, to be by the defendants conveyed and carried from Clinton to Chicago, at the rate of $47 for each car load, to be paid by the plaintiff to the defendants on the delivery of said hogs to plaintiff at Chicago; said hogs consisting of a large number, to wit, one hundred and one hogs. And the plaintiff avers, that, on the day and year aforesaid, at the county of De Witt aforesaid, the defendants, being such common carriers, as aforesaid, would not accept and receive said hogs, to be so carried and conveyed, unless the plaintiff would enter into and sign a certain agreement, partly written and partly printed, with certain printed

matter attached thereto, which said written agreement was in substance the same as that in the next preceding count described and set forth, and which is made a part of this count [*see receipt or agreement hereafter set out*] and the plaintiff did then and there sign said agreement, and the defendants did then and there accept said hogs, and did then and there attach the cars containing said hogs to a railroad train of the defendants, and with said train commenced the journey from Clinton to Chicago; and that when said train had proceeded on said journey more than seventy miles, to wit: to the station at Bloomington, on said road, the said hogs were greatly heated, and it then and there became necessary to water said hogs, by throwing large quantities of water into the cars containing the same, and upon said hogs, to prevent the same from being greatly damaged and injured; all of which was then and there well known to the agent of the defendants, then and there in charge of said train. And the plaintiff further avers, that the said agent of the defendants did not, nor would so water said hogs, but did then proceed with said hogs upon said journey to the station of Normal, on said railroad, and that, when said hogs reached said station of Normal, the said hogs were still more heated, and had greater need of being so watered; and the plaintiff then and there requested said agent, so in charge of said train, so to water said hogs at said Normal station; but the said agent of defendants, well knowing the condition of said hogs, and the great need of the same, then and there wholly refused so to water said hogs, but on the contrary, proceeded on said journey with said hogs, without so watering the same, to El Paso station, on said road, more than forty miles from Clinton, aforesaid. And the plaintiff avers, that, when said hogs reached said station of El Paso, the same were greatly suffering, and endangered by reason of not being, or having been, so watered; and that the plaintiff did thereupon request and urge the said agent of the defendants in charge of the said train, so to water said hogs, but the said agent of the defendants, well knowing the premises, wholly neglected, failed and refused so to water said hogs, for a long space of time, to wit, for the space

of forty minutes, after being so requested, and after said train reached El Paso station, as aforesaid; and that said agent did keep said train standing at said station during the period aforesaid, when the said agent might have easily watered said hogs, as he well knew they greatly needed.

And the plaintiff further avers, that, during all the time from the commencement of said journey, the said train was under the control of said agent of the defendants; and that at divers stations on said railroad from Bloomington, aforesaid, to El Paso, aforesaid, and at both of said stations, the defendants have water tanks standing close to said road, from which the agent could easily and without serious delay have watered said hogs; and that the plaintiff, during all said time, had no control of said train, and had no means whatever of so watering said hogs; and that it was then the general custom of railroad companies, carrying hogs, so to water such hogs when necessary; all of which was then well known to the said agent.

And the plaintiff further avers that it was the duty of the defendants to have watered said hogs of the plaintiff, on said journey, and the exercise of reasonable care by said agent required him to cause said hogs to be so watered; yet the agent of defendants, so in charge of said train, knowingly, willfully, and through gross carelessness and negligence, throughout all said time, wholly neglected and refused so to water said hogs, or any of them, although repeatedly requested so to do by the plaintiff, by means whereof, and for want of so being watered, a large number, to wit, twenty-two of said hogs, of great value, to wit, of the value of eight hundred dollars, while on said journey, died, and were thereby reduced in value to the extent of a large sum of money, to wit, five hundred dollars; and the remainder of said hogs were by means aforesaid, and from being confined in said cars with said dead hogs, greatly reduced in value, to wit, to the extent of one hundred dollars; and the said hogs were, on the day next after the day aforesaid, delivered to the plaintiff by the defendants, at Chicago aforesaid, the said twenty-two hogs being dead, and the remainder thereof injured as aforesaid.

And the plaintiff avers that he did then and there pay the defendants for carrying and conveying the said hogs from Clinton aforesaid, the said sum of $47 for each of said two car loads.

By means of which said several premises, the defendants became liable to pay to the plaintiff the amount of the damage by him sustained as aforesaid, notwithstanding any thing in said written agreement contained, and by means of all of said several grievances the plaintiff has sustained damages to the amount of one thousand dollars, and therefore he brings suit, etc.

The defendants filed the general issue as to the fourth count.

*John Minor* testified: May 4, 1865, I helped plaintiff to load two car loads of hogs at Clinton, Illinois, for Chicago; put forty-nine in one car and fifty in another; hogs in good order; would average 230 pounds each; not crowded in car; number of hogs to car load depends something on size of hogs and state of weather; it was warm for 1st of May; helped drive hogs from Wisegarver to Clinton; don't know distance; drove them through several branches; last place I remember letting them drink was from one to two miles back; got to Clinton between ten and eleven o'clock; put the hogs in cars at four or five o'clock in the afternoon; don't remember whether there was water in ditches or hog yard; left Clinton between five and six o'clock; forty-nine to fifty-five hogs of that size make a fair car load in good weather, and forty to forty-five in hot weather; depends good deal on size of hogs and state of weather; hogs of plaintiff not over-crowded; I have never traveled in charge of hogs, but loaded many hundreds.

*Robert M. Shaw*, sworn: I know the plaintiff; was on train containing hogs, May 4, 1865; had some hogs in same train; first saw plaintiff's hogs at Wapellah, four and one-half miles north of Clinton; no one with them; I noticed they were becoming heated and needed water; this was about six o'clock; I know something of hogs; have dealt in them, and shipped

Statement of the case.

for years; when they become heated in traveling, they ought to be cooled by having water thrown upon them; never found any trouble in getting this done; when there are water tanks on railroad can be done in a few minutes by running up to water tanks and pouring water from spout over hogs; it is the custom of railroads to water hogs when required; cars stopped at Bloomington; more than twenty miles from Clinton, I looked at plaintiff's hogs; they were suffering very much for want of water; they were heated, and many in a dying condition; plaintiff was not on train; I went to conductor of train and told him they ought to be watered; he replied, that it was not his business; this occurred while the train was at Bloomington; train then went on about two miles and hauled off on a switch; the hogs were growing worse, and making a "peculiar noise," which hogs make when they are overheated; passenger train from south caught up with us here; plaintiff came on and got on freight train; soon as plaintiff came and saw condition of hogs, he went to conductor, in my presence, and asked him to water hogs; conductor refused, and said it was not his business; plaintiff insisted, and said if hogs were not watered one-third of them would die; conductor replied, you will do d—n well if one-half of them do not die; this was while the train was standing on the track at Normal station; there was a water tank there belonging to the company; then started and ran to El Paso, which is some seventy-five miles from Clinton; again I saw plaintiff's hogs at El Paso; were in a very bad condition; plaintiff went again to conductor as soon as train stopped and asked him to water the hogs; he again replied he would not, it was not his business; the hogs were then run off on the Y; there was a water tank at El Paso with two spouts, one over the main track and one over the Y; when the conductor refused to water the hogs, plaintiff and I started to the office, and found the station agent, and told him how matters stood; he replied it was the duty of the conductor to water the hogs, and went with plaintiff and witness in search of conductor, and found him; agent told conductor, that it was his business to water the hogs, and he must do it; conductor

replied, that he knew it was his business, and he would do it, he seemed very willing then; he did then water the hogs, but not until they had been standing at El Paso three-quarters of an hour; defendant had water tank at Bloomington, Normal, Hudson, Kappa and El Paso; hogs were then taken to Chicago; got there about eleven o'clock the next day; when we got there, from twenty to twenty-two of plaintiff's hogs were dead; dead hogs weighed from 230 to 250 pounds each; live hogs of that quality were that day worth from ten and one-half to eleven cents per pound in Chicago; don't know what plaintiff got for dead hogs, but dead hogs were worth at that time two or three cents per pound; hogs of plaintiff which did not die were injured; they looked badly; they had been tramping on dead hogs and had become covered with grease and looked diseased; live hogs were damaged from fifty-five to sixty cents per 100 pounds; ten o'clock in the evening when the train got to El Paso; I am satisfied, that, if the hogs had been watered, they would have gone through safely; not overcrowded for such sized hogs.

*Bentley Mills* sworn: Have been engaged in shipping hogs by railroad for twelve years; forty-five to fifty hogs make car load, depending on size and condition; when hogs are heated in transportation, should be cooled by having water thrown on them; I always do this with my hogs when they need it; I was in Chicago when plaintiff's hogs came there on May 5th; twenty-two died, six or eight of which were worth nothing; other dead hogs were worth and sold for two cents per pound; live hogs worth from ten and one-half to eleven cents per pound; they were injured for want of water, and by trampling on dead hogs, at least fifty cents per cwt.; live hogs looked bad,—were covered with grease; heard men object to buying them on account of their appearance; they feared they were diseased; the man who did buy them refused to do so until witness said he knew plaintiff, and that their bad condition was owing to trampling on dead hogs.

*James Deland* sworn: Has had twenty years experience in shipping hogs; has seen hogs watered in the cars; fifty hogs is a car load; thinks plaintiff's hogs would average 238 pounds;

whether hogs should be watered on cars depends on circumstances; I would always water them when they make that peculiar noise that shows they are in danger, when they must be watered to save them; when they are not extremely heated, and there is a deep bed of straw or manure in the car, then I do not think they ought to be watered, because bedding holds the water and produces a hot steam which injures the hogs; when there is no bedding they ought to be watered, and they should be watered in any event when they make that peculiar noise.

*Darius Hall* sworn: Have been handling hogs twenty-five years; when hogs become heated, they should always be cooled by having water thrown on them; I have no doubt of this; when they become very hot, if not so watered, they will die.

### LIVE STOCK.

### *Extract from Freight Tariff.*

Non-enumerated live stock of all kinds, not shipped under contract, will be charged first-class rates.

Enumerated live stock, in less quantities than car loads, will be charged first class, at the following estimated weights:

One horse (except stallions), . . . . . . . . . . . . . . . . . . . . . 2,000 lbs.
Two horses, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,500 "
Three " . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,000 "
Each additional, . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,000 "

Stallions will be reckoned at 4,000 pounds, and taken at first-class rates.

Horned animals, 2,000 pounds each, second class. Calves and sheep, less than car load, 200 pounds each (but not in any instance less than 75 cents each), once and a half first class. Hogs, less than car load, actual weight, once and a half first class. The company will not assume any liability over one hundred dollars on horses and valuable live stock, except by special agreement. Agents are not allowed to receive and ship such valuable horse or other animal until a proper contract or release is signed by the owner or shipper thereof. At the above rates, the owner

31 — 42D ILL.

is to feed, water and take care of his stock, at his own expense and risk, and is to assume all risk of injury or damage that the animals may do to themselves or to each other, or which may arise from delay of trains. Stock will only be taken by the car load, at the price fixed under the table of "special rates," when the contract is executed by the station agent and shipper, to be loaded and unloaded, watered and fed by the owner, and at his risk in all respects, except as specified in form of contract or receipt in hands of agents. Two or three cars of stock will entitle the owner, or one driver, to pass on the train with the stock, to take care of it. Four cars and upward, one owner, two men in charge, to pass on stock train, which is the maximum number that will be passed on any train from one consignor or party. All persons thus passed are at their own risk of personal injury from any cause whatever. The agent at the station where the stock is loaded will give no passes, but must enter on the back of contract the name or names of the persons who are *actually* entitled to pass free with the stock, which is the authority for the conductor to pass them. Agents will refuse to enter any name on contract but those of owner or employees in charge, without regard to passes required by number of cars. No return passes will be given Slaughtered hogs carried only at the risk of the owner, as to the weather and delay of train, at tariff rates. No agent is authorized to make an agreement for the shipment of live stock, fresh provisions or slaughtered hogs, at any particular time. Due diligence will be observed in sending them forward.

5 cent
U. S. Rev.
stamp.          FREIGHT OFFICE, ILLINOIS CENTRAL RAILROAD Co., }
CLINTON, May 4, 1865.          }

Received of P. S. Adams, two cars of hogs, 100 more or less, to be delivered at Chicago station, at special rates, being forty-seven dollars per car. In consideration of which, and for other valuable considerations, it is hereby mutually agreed that said company shall not be liable for loss by jumping from the cars, delay of trains, or any damage said property may

sustain, except such as may result from a collision of the train, or when cars are thrown from the track in course of transportation.   To be fed and taken care of by owner.

Subject to 2½ per cent United States tax.

JAMES A. RASBACK, *Agent.*

P. S. ADAMS.

Defendants admitted that they were carriers, and that the termini of the road were correctly stated.   Defendants then called one Perigo, a release having been given him.   He then swore : Was the conductor on the freight train that took Adams' hogs ; put in his train at Wapella, four and a half miles north of Clinton ; these hogs were badly crowded in the cars ; from eight to ten too many for such warm weather ; no one called my attention to these hogs at Bloomington ; after I left Normal, Adams came to me and asked me to water his hogs ; I replied to him, that we had no water from Normal to El Paso, where I would switch them on the side track, and the switchman would water them ; I would have watered them at Normal if Adams had asked it before I left the station ; I was not in the caboose after I left Bloomington until I got one and a half miles north of Normal ; I did not see Adams until I got up the grade north of Normal ; I then went back to the caboose to collect tickets, and Adams showed me his pass, and spoke to me about watering his hogs, and I replied as above ; Normal was the first place where I could have watered the hogs, if I had been asked at Bloomington ; as soon as I got to El Paso, ran hogs on side track, coaled, watered, and went on to Amboy, in fifteen or twenty minutes ; from my knowledge of the position of the cars containing these hogs, and the engine that was making up the train for Chicago, it would take about thirty minutes to have got these hogs to the tank ; if every thing had been ready it would have taken fifteen or twenty minutes ; this time is controlled by the position of the engine and the crowded condition of the tracks ; from thirty to forty minutes would be the usual time it would take to get the cars to the tanks.

The defendants introduced other witnesses showing that the

plaintiff could have watered his hogs at Clinton, and had not done so.

Instructions were given for the plaintiff, and others asked by defendants were refused.

A verdict was returned for the plaintiff for $505.12 damages. A new trial was refused, and judgment entered upon the verdict. The defendants thereupon took this appeal.

The questions presented are, whether it was the duty of the company to apply the water to the hogs when in a heated condition, and failing to do so on request, whether it amounts to such gross negligence against which it was not in the power of the company to stipulate.

Mr. C. H. MOORE, for the appellants.

Under the old law of carriers, when their duties were confined to carrying a few persons or parcels of inanimate matter, the law was rigid and very severe. But as commerce increased railroads were invented, and now the very class of animals once used by common carriers are themselves put into cars and carried for hundreds of miles. Animals used for food, dangerous to themselves and to every thing around them, are put into cars, confined in a small space. The risk that they might injure themselves, or other stock in the car with them, or break out of the car, was now apparent to every one, and courts soon modified the law, by saying that carriers might protect themselves by special contracts from all acts, except their own gross negligence. This court has decided this point. See *Illinois Central Railroad Company* v. *Morrison & Crabtree*, 19 Ill. 139; 2 Ohio, 133; Redfield on Railways, 177, note; 10 Ohio, 72; 26 Barb. 641; see also *Illinois Central Railroad Company* v. *Read*, 27 Ill. 485. `

The company then, we say, had a right to make this contract. Under this contract the company agreed to be liable for three things,—first, due diligence in sending stock forward; second, for damages resulting from a collision of the train; third, for damages when the cars are thrown from the track. Every other kind of damage that the hogs might receive in the course

of transportation is to be borne by the shipper; and to guard against this very contingency the company have inserted two clauses, one at the bottom of the contract in plainer letters than the contract itself, " To be fed and taken care of by the owner." To feed means to give liquid as much as solid food. It is any thing and every thing necessary to sustain life in the hogs; but it may be claimed that watering hogs on the cars does not mean to let them drink, but only to pour water over them, and let them take it by absorption. We say it means both. And, by a clause in the upper part of the contract, or notice above the contract, the company expressly stipulates that the stock is to be " loaded and unloaded, watered and fed by the owner at his own risk in all respects, except as specified in the contract or receipt." The reason for this limitation of liability is obvious; many times the company was troubled to get the amount of water required for its own use. The breaking of a pump or bursting of a tank might make them liable for a train of hogs, and the time taken to water might render them liable for not using due diligence in forwarding the stock intrusted to their care.

The certainty that they could not at all times and in all places water hogs, made it necessary for them to warn each shipper that they would not water or feed stock at all. If they are compelled to water stock, they are certainly compelled to feed it if necessary. The breaches alleged did not constitute a cause of action under the contract.

Again, granting, for the sake of the argument, that the conductor himself could have watered these hogs at Normal or at El Paso, it was competent and even proper for the company to stipulate in the contract that the hogs were to be fed and taken care of by the owner, in one place, and fed and watered in another. The words " taken care of by the owner," we say involve feeding and watering, and if any break out of the cars they are to be put back by the owner, so that the company might not be liable for the failure of a conductor to water the hogs. A railroad company have the right, by express contract, to protect themselves against the negligence of its agents, unless

it is so gross as to be fraudulent, See 37 Ill. 484; *Wells* v. *New York Central Railroad Company*, 24 N. Y. 181; *Perkins* v. *The Same*, 196, and *Beisiegel* v. *The Same*, 25 id. 442; and in one decision, *Wells* v. *Steam Navigation Company*, 4 Selden, 381, the courts say: "Although the law will not suffer a man to claim immunity by contract from his own fraud, I know of no reason why this may not be done in reference to fraud or felony committed by those in his employ." *Smith* v. *New York Central Railroad*, 24 N. Y. 222, is also in point. It is true that, in this contract, the words "servants or agents" are not used, nor is it strictly necessary in this case to decide the last point; but this kind of an action is provided against by saying just what the company shall be liable for, and no other. No other acts or omissions except the want of due diligence in sending them forward, a collision of the train, or the cars being thrown from the track, can make them liable to Adams. Again, it seems to be disputed whether hogs should be watered on the cars or not. Deland, one of Adams' witnesses, says if they have a deep bed of straw it makes them worse. All these questions were excepted by the express contract.

Messrs. H. S. GREEN & L. WELDON, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was an action on the case, brought in the De Witt Circuit Court by Parker S. Adams against the Illinois Central Railroad Company, for negligence in transporting certain car loads of live hogs from Clinton to Chicago, by reason whereof a number of the hogs died.

The cause was tried by a jury, and a verdict for the plaintiff for $505.12. A motion for a new trial was made and overruled, and exception taken. Exceptions were also taken to the judgment of the court refusing certain instructions asked by the defendant, in modifying others and in giving instructions in behalf of the plaintiff. The case is brought here by appeal.

The declaration, as filed, contained four counts, to the first

three a demurrer was sustained, and the trial was had upon the fourth count, in which the averment was, that the defendants were guilty of gross carelessness in not watering the hogs, by means whereof they were injured to the amount of $1,000.

Various errors are assigned, but the controversy depends principally on the instructions and the nature of the contract entered into by the parties.

It is insisted by the appellants, that, by the contract of shipping, the company was not liable for any loss except such as might result from a collision of the train, or when the cars were thrown from the track in course of transportation, and that the hogs were to be fed and watered by the owner and to be at his risk in all respects except as specified in the form of the contract or receipt in the hands of the agent.

The phrase, "feeding and watering," as used in the contract, has reference alone, as we understand the contract, to the ordinary sustenance such animals require in the course of transportation, while the negligence complained of, and for which the railroad company is sought to be charged, is the application of water externally to hogs confined in cars, causing them to become much heated, and from which speedy death ensues if they are not promptly relieved by this application.

The whole case turns upon the fact of the liability of the company to apply this water, and, failing to do so on request, does it amount to such gross negligence against which it is not in the power of the company to stipulate?

The proof is clear that it is the custom of the railroad agents to make this application of water, and it is most reasonable and just that it should be their duty, for their employers own the trains, the tanks and the water within them, and have entire and exclusive control of all the movements and stoppages of the trains, with which no shipper can, in the slightest degree, interfere. Were it not so, who can estimate the derangement to which trains would be subjected, did every shipper control its movements,— did he have the power to stop it for any purpose or appropriate water at an inconvenient or improper station when there might be but a scanty supply not in excess of the

necessities of the boilers? Good policy and a due regard to the operations of the trains, require that this duty of watering live hogs in the manner described in the evidence should devolve upon those who manage the trains, and not upon the shippers of such stock. The contract referred to in the declaration had no reference to this matter, but to their ordinary feeding and watering, which duty properly belonged to the owner.

If, then, it was gross negligence in the conductor of the train carrying these hogs, in refusing to apply water to them when requested at Bloomington or at Normal, at which latter place water was convenient and abundant, the company could not contract against that. This court said, in the case of *Ill. Central R. R. Co.* v. *Crabtree & Morrison*, 19 Ill. 139, that, although a railroad company might protect itself by contract against certain risks assumed by common carriers and belonging to their vocation, it was contrary to good morals and public policy that they should be allowed to stipulate against their own gross negligence, or that of their employees, or their willful default.

The jury have found there was gross negligence in this case. It is true, the testimony was contradictory on this point, but the jury have given the most credit to Shaw, the witness for plaintiff, who testified to his own interference with Perigo, the conductor, when the train was at rest at Bloomington, and also when it was on the switch at Normal, and at both places distinctly informed the conductor of the suffering condition of the hogs for the want of water, and of the personal appeal of the owner to the same conductor to apply the water. Perigo, the conductor, denied all this, and it was exclusively for the jury to weigh the testimony of both, and give the credit where they thought it most properly belonged, and, with their decision in this regard, this court is not permitted to interfere. The testimony of Shaw fully establishes gross negligence of a willful character, and inexcusable in any light in which it can be regarded. If excusable at Bloomington, on account of a scarcity of water or a total want of a supply there, it was not so at Normal, where the train rested long enough to have performed the

operation more than once if needed. But the appellant's counsel insists, that it was the gross neglect of appellee in not watering the hogs at Clinton, after driving them more than four miles, and suffering them to remain in the stock yard there without water, from ten o'clock in the forenoon until four or five o'clock in the afternoon, when they were placed on the cars.

Most of the witnesses say it would have been a good thing to have watered the hogs at Clinton, but no one attributes the deaths and injuries to this omission, nor does there seem.to have been any necessity for watering them there before placing them on the cars. It was not water internally the animals needed; and, as it was a wet time at which they were driven to Clinton, and several branches of water crossed on the route thither, it is reasonable to suppose they had their fill of that element, and it was only when confined in the cars that they suffered for the want of it, and the conductor was deaf to every appeal made to him to supply water until the train had reached El Paso, a distance of more than forty miles from Clinton, and then denied water, until the station agent at that place directed the conductor to do his duty by supplying water. At this point the hogs were transferred to the cars going to Chicago, and Perigo's train proceeded on the main track. The counsel for appellant insists, it was not the duty of this train to engage in switching, or any thing else, but to coal and water, and hitch on such cars as were to go north by his train.

This being so, then, most imperative and overwhelming was the duty of this conductor to apply the water at Normal, when he was requested by the owner to do it, and the animals then in a suffering and dying condition. He knew he could not take the time at El Paso. He knew he had other duties there which would engage his train, and, when he arrived there, it was only by the interference of the station agent he made any movement in the direction desired. If the jury believed the statement of Shaw, a case of recklessness, of gross negligence, by conductor Perigo, was fully established.

The views here presented fully dispose of all the objections taken to the instructions.

Those which were refused, as asked by appellant, were substantially embraced in those given.

Perceiving no error in the record, the judgment must be affirmed.

*Judgment affirmed.*